# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                              )
**GLORIA WILLINGHAM,**        )
                              )
    **Plaintiff,**        )
                              )  **Civil No. 02-1972 (ESH)**
   **v.**                )
                              )
**ALBERTO GONZALES,**         )
 **Attorney General of the United States,** )
                              )
    **Defendant.**        )
_____)

## MEMORANDUM OPINION

Plaintiff is an attorney formerly employed by the Drug Enforcement Agency (DEA) who was suspended and then terminated for off-duty misconduct. She brought suit against the DEA alleging gender and race discrimination and retaliation for her past EEO activity in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*., and age discrimination in violation of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 631 *et seq*. She further asserts that the decision of the Merit Systems Protection Board ("MSPB") affirming her suspension and removal was not based on "substantial evidence," *see Fogg v. Ashcroft*, 254 F.3d 103, 112 (D.C. Cir. 2001), and therefore violated the Civil Service Reform Act of 1978 ("CSRA"), as amended, 5 U.S.C. §1101 *et seq*. Plaintiff's age and gender discrimination claims were dismissed with prejudice in an Order issued by this Court on March 19, 2004. Defendant now moves for summary judgment as to the remaining counts. For the reasons set forth below, the Court finds that defendant's motion should be granted.

# BACKGROUND

## I.      Plaintiff's Arrest

Plaintiff worked as an attorney-advisor in the DEA Office of the Chief Counsel from

1978 until September 21, 2000.  (Am. Compl. & Answer to Am. Compl. ¶¶ 6, 36.)  At the time

of her termination, she was working in the Administrative Law Section of the Office of the Chief

Counsel.  (Am. Compl. ¶ 4.)  The events leading to plaintiff's removal from federal service took

place on December 12, 1998.[1]  Early that morning, plaintiff was arrested and charged with

obstruction of justice following a confrontation with four policemen from Fairfax County,

Virginia.  (Def.'s Facts ¶ 4.)  The officers were responding to a 911 call alerting them to a

domestic disturbance at the home of Carl Jackson, a friend of the plaintiff's.  (Def.'s Facts

¶¶ 4-5.)  Plaintiff asserts, and the defendant does not contest, that she and Jackson arrived at the

house after the 911 call had been made but before the police arrived. (Pl.'s Opp. at 5.)  Soon after

arriving, the police determined that the dispute leading to the 911 call involved Jackson's son,

Carl Jackson III (hereinafter Jackson III).  Jackson III and his girlfriend, Leila Jackson

(hereinafter Ms. Jackson), had gotten into a fight that led to her calling 911, but the fight was

---

[1] A party opposing summary judgment assumes the burden of producing evidence of "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); *see also* Anderson *v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  To do so the party must provide "references to the parts of the record relied on to support the statement."  LCvR 7(h) & 56.1. Neither Plaintiff's Statement of Genuine Issues Filed in Opposition to Gonzales' Motion for Summary Judgment nor her Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment comply with the dictates of Local Civil Rules 7(h) and 56.1.  Rather, they consist of "boilerplate denials" and "unsubstantiated allegations" that cannot be credited by this Court.  *Kaseman v. District of Columbia*, 329 F. Supp. 2d 20, 24 n.2 (D.D.C. 2004).  It is not the responsibility of the Court to search the record for facts that might support the plaintiff's claim.  Thus, with few exceptions,  the Court will treat the facts found in the Defendant's Statement of Material Facts Not in Dispute (Def.'s Facts) and the exhibits in support thereof as admitted by the plaintiff for purposes of the summary judgment analysis.

resolved and his girlfriend left before the police arrived.  (Def.'s Ex. 1-D (Report of Officer

Bassett).)  The officers asked for Ms. Jackson's telephone number so that they could verify that

she was no longer at Jackson's house.  Jackson asked plaintiff to watch the door while he went to

get Ms. Jackson's number.  While Jackson was inside, plaintiff attempted to close the front door

despite the officers' instructions not to.  One officer kept his foot in the door to prevent her from

shutting it.  (*Id*.)

Jackson returned with his address book and though he claimed not to have the number,

one of the officers saw Ms. Jackson's number as Jackson flipped through the pages.  (Def.'s Ex.

1-D (Report of Officer Buck).)  One of the officers called Ms. Jackson to ensure that she had

safely left the premises.  While speaking to the officer, Ms. Jackson received a call from plaintiff,

who, according to Ms. Jackson,  wanted her to tell the police that they were no longer needed at

the house.  (*Id*.)  According to Ms. Jackson's later sworn court testimony, she received three or

four phone calls from plaintiff during the time when the police were at Jackson's house.  (Def.'s

Ex. 1-H.)  Ms. Jackson informed the police that Jackson III lived at the house and had been there

when she left.  The officers then ran a computer check on Jackson III and discovered three

outstanding warrants for his arrest.  (Def.'s Facts ¶ 7.)  The officers informed Jackson, who was

outside the house at that time, that they were going to enter the premises to search for Jackson III,

with or without his permission.  They banged on the door, and plaintiff opened it slightly, at

which point Jackson attempted to block the officers from entering.  A physical altercation ensued

and Jackson was handcuffed and placed in a police cruiser.  (Def.'s Ex. 1-D (Report of Officer

Bassett).)  Plaintiff proceeded to block the officers' access to the rest of the house after they

entered through the front door.  (Def.'s Ex. 1-D (Report of Officer Crooke).)  Plaintiff was asked

not to impede their progress, then warned that she would be arrested for obstruction of justice if she did not obey their instructions.  According to the police, plaintiff refused to cooperate and was arrested, handcuffed and placed in a police cruiser.  The police then arrested Jackson III, who was upstairs in the house.  (*Id*.)  All three were taken to the Fairfax County Adult Detention Center where.  During the booking processing, plaintiff provided inaccurate personal information to the police, both misspelling her name and giving her brother's address as her home address.  (Def.'s Ex. 1-D (Report of Officer Buck); Def.'s Ex. 1-I (Proposal Letter, Removal).)

## II.     Plaintiff's Suspension

Following her release from custody, plaintiff contacted her supervisor, DEA Associate Chief Counsel Charles Walden, and informed him of her arrest.  (Def.'s Ex. 1-B.)  At a meeting on December 14, 1998, DEA Chief Counsel Cynthia Ryan, Chief Inspector Felix Jiminez and Deputy Administrator Donnie Marshall decided that the DEA Office of Professional Responsibility ("OPR") should open an investigation.  Based on the results of the OPR investigation, on January 21, 1999, Deputy Administrator Marshall proposed that plaintiff be indefinitely suspended without pay pending the adjudication of her criminal charge.  (Def.'s Ex. 1-E.)  The proposal letter stated, "[o]bstruction of justice is incompatible with service as a legal representative of a law enforcement agency in the Department of Justice," and therefore suspension was necessary "to promote the efficiency of the service."  (*Id*.)  Catherine Reeves, the Deputy Director of  the Office of Attorney Personnel Management ("OAPM") at the Department of Justice, approved plaintiff's indefinite suspension, finding "reasonable cause to believe that [plaintiff] committed the crime of obstruction of justice."  (Def.'s Ex. 1-F.)  As a result, plaintiff was suspended without pay pending the resolution of the criminal charge.

4

**III.     Plaintiff's Removal from Federal Service**

A bench trial was held on May 26, 1999, in the Fairfax County General District Court. The judge dismissed the charge of obstruction of justice after only one officer appeared to testify, finding the charge had not been proven beyond a reasonable doubt.  (Def.'s Ex. 1-G.)  In response, the DEA lifted plaintiff's indefinite suspension and placed her on administrative leave with pay.  OPR continued its investigation and issued a final report on October 13, 1999.  (Def.'s Ex. 1-H.)  The report, which was based on sworn interviews with the participants, the Fairfax County police reports, and the trial transcript, presented both the officers' and the plaintiff's account of the events of December 12, 1998.  After reviewing the OPR report, DEA Deputy Administrator Marshall proposed terminating plaintiff from federal service and explained the bases for his recommendation in a letter dated April 13, 2000.  (Def.'s Ex. 1-I.)  The letter charged plaintiff with Conduct Unbecoming a DEA Employee, Making False Statements and Poor Judgment.  The Deputy Administrator detailed four instances of Conduct Unbecoming an Employee: attempting to impede the officers' entry into Jackson's house; being combative and refusing to cooperate when being placed in the police cruiser; providing incorrect personal information to the police after her arrest; and failing to obtain a Virginia driver's license -- a violation of state law.  The Deputy Administrator cited the "consistence and detail" of the officers' testimony in finding their account of the events "more credible than [plaintiff's]."  (*Id.*) The False Statements charge was based on plaintiff's testimony that she did not know Ms. Jackson prior to the night of the arrest and her mischaracterizations regarding her phone calls to Ms. Jackson while the police were at Jackson's house.  The Deputy Administrator considered plaintiff's testimony to be "false" with respect to the number of times she called Ms. Jackson and

the purpose of those calls, finding it "likely that you called Ms. Jackson to reproach her for having called the police in the first place and to urge her . . . to tell the police that everything was okay so they would go away." (*Id*.)   Plaintiff was charged with Poor Judgment because of her attempt to contact Ms. Jackson at a time when she knew the police were trying to reach her.  The Deputy Administrator also took into account plaintiff's performance record during her tenure at the DEA, including several past disciplinary actions.  Finding plaintiff's actions "incompatible with service as a legal representative of a law enforcement agency in the Department of Justice," the Deputy Administrator proposed that plaintiff be terminated from federal employment.  (*Id*.)

In a letter dated September 21, 2000, Deputy Director of the OAPM Catharine Reeves, upheld the Deputy Administrator's recommendation and removed plaintiff from federal service. (Def.'s Ex. 1-J.)  Reeves found that the evidence supported three of the four specifications of Conduct Unbecoming a DEA Employee, rejecting only plaintiff's failure to obtain a Virginia driver's license as a basis for termination, and sustained the charges of Making False Statements and Poor Judgment.  (*Id*.)  Reeves took into account plaintiff's positive performance rating but also noted her three prior disciplinary actions, finding that she had "a history of failing to take responsibility for [her] actions and of being less than honest and cooperative in investigations of [her] prior misconduct."  (*Id*.)  Seeing "no ... potential for rehabilitation," Reeves determined that removal was necessary "to promote the efficiency of the service."  (*Id*.)

Plaintiff's appeals to the MSPB and the DOJ's Equal Employment Opportunity Office were consolidated before the MSPB, which  issued a final decision affirming plaintiff's suspension and removal on August 12, 2002.  (Def.'s Ex. 1-L.)

This Court previously dismissed with prejudice plaintiff's claims in Counts III, V and VI for sex and age discrimination. Defendant now moves for summary judgment on the remaining claims alleging race discrimination (Counts I and II), retaliation (Count IV) and violation of the CSRA (Counts VII and VIII).

## ANALYSIS

### I.   Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that a motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255; *see also Wash. Post Co. v. U.S. Dep't of Health and Human Servs.*, 865 F.2d 320, 325 (D.C. Cir. 1989).

To escape summary judgment the non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The non-moving party must provide evidence that would permit a reasonable jury to find in the non-moving party's favor. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (citations omitted). "While summary judgment must be approached with special caution in discrimination cases, a plaintiff is not relieved of her obligation to support

her allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Calhoun v. Johnson*, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. March 31, 1998) (internal citation omitted), *aff'd*, No. 99-5126, 1999 WL 825425, at *1 (D.C. Cir. Sept. 27, 2000).

## II.   Title VII:  Counts I, II and IV

Under Title VII, all employment decisions made by a federal employer must "be made free from any discrimination based on race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-16(a).[2/]  Title VII further makes it unlawful "for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this [title]."  42 U.S.C. § 2000e-3(a).  Counts I and II of the amended complaint allege disparate treatment based on race with respect to plaintiff's indefinite suspension and termination from federal service.  (Compl. ¶¶ 45, 48).  Count IV alleges that plaintiff was terminated in retaliation for having engaged in statutorily protected activity.

### A.   Race Discrimination:  Counts I and II

Allegations of race discrimination in violation of Title VII are analyzed under the familiar *McDonnell Douglas* three-part "shifting burdens" test.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Plaintiff has the initial burden of proving a prima facie case of discrimination.  *Id.* at 802.  To do so, plaintiff must establish: (1) that she is a member of a protected class;

---

[2/]  Title VII instructs, with respect to private employers, that it is "an unlawful employment practice ... to discriminate against any individual with respect to his . . . employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Despite the slight differences in language, it is well established that "Title VII places the same restrictions on federal and District of Columbia agencies as it does on private employers, and so we may construe the latter provision in terms of the former."  *Bundy v. Jackson*, 641 F.2d 934, 942 (D.C. Cir. 1981) (internal citations omitted).

(2) that she suffered an adverse employment action; and (3) that the unfavorable action gives rise to an inference of discrimination. *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999). If she succeeds, the burden shifts to defendant to articulate some legitimate, nondiscriminatory reason for its actions. *Id.* Defendant's burden is only one of production, and it "need not persuade the court that it was actually motivated by the proffered reasons." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993) ("[T]he determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment.").

If defendant is successful, then "the *McDonnell Douglas* framework -- with its presumptions and burdens -- disappear[s], and the sole remaining issue [is] discrimination *vel non*." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000) (internal citations and quotation marks omitted). At that point, plaintiff has the burden of persuasion to show that defendant's proffered nondiscriminatory reason was not the true reason for the employment decision. *Burdine*, 450 U.S. at 256; *see also Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003) ("[a]lthough the *McDonnell Douglas* framework shifts intermediate evidentiary burdens between the parties, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff") (internal citations and quotation marks omitted). "At this stage, if [plaintiff] is unable to adduce evidence that could allow a reasonable trier of fact to conclude that [defendant's] proffered reason was a pretext for discrimination, summary judgment must be entered against [plaintiff]." *Paquin v. Fed. Nat'l Mortgage Ass'n*, 119 F.3d 23, 27-28 (D.C. Cir.

9

1997).  Pretext may be established "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Burdine*, 450 U.S. at 256.

Plaintiff easily meets the first two elements of a *prima facie* discrimination claim: as a female African-American, she is a member of a protected class, and suspension and removal from her job clearly constitute adverse employment actions.  Plaintiff's claim fails, however, because she cannot establish the third *prima facie* element: that the unfavorable action gives rise to an inference of discrimination.  *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002).  While multiple methods exist to satisfy this element, *see George v. Leavitt*, 407 F.3d 405, 412-413 (D.C. Cir. 2005) (describing various allegations that give rise to inference of discrimination), plaintiff asserts only a "disparate treatment" claim (*i.e.*, that the agency discriminated against her by treating her differently from "similarly situated employees" who are not part of the protected class).  *Mack v. Strauss*, 134 F. Supp. 2d 103, 114 (D.D.C. 2001); *see also Brown*, 199 F.3d at 452; *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1150 (D.C. Cir. 2004).  To be "similarly situated" for purposes of Title VII, a plaintiff must demonstrate that another employee "charged with offenses of 'comparable seriousness'" did not suffer a similar adverse action.  *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999) (*quoting Lynn v. Deaconess Med. Ctr. W.*, 160 F.3d 484, 488 (8th Cir. 1998)).  The plaintiff must show that "all of the relevant aspects of her employment situation were 'nearly identical'" to the comparable employee.  *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995) (*quoting Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)).  Unless the plaintiff can point to evidence in the record of another employee whose conduct and conditions of employment was

sufficiently "similarly situated in all material respects . . . to support at least a minimal inference

that the difference of treatment may be attributable to discrimination," a disparate treatment

claim under Title VII cannot succeed.  *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir.

2001).  Thus, in *McGuinness*, a white woman who was offered a severance package substantially

less generous than one offered to a black male of the same rank who was fired at the same time

and for the same reason successfully established a *prima facie* case of disparate treatment.  *Id*.

However, a female associate at a law firm who was fired for being unable to get along with her

co-workers was not similarly situated to a less senior male associate whose work product was

unacceptable but was not fired.  *Neuren*, 43 F.3d at 1514.

By Orders of this Court and Magistrate Judge Facciola, issued on July 20, 2004 and

January 25, 2005, respectively, plaintiff was granted discovery with respect to every disciplinary

action at DEA during the tenure (from February 1998 until November 2001) of the two officials

responsible for her termination -- DEA Deputy Administrator Donnie Marshall, who proposed

removal, and DOJ Deputy Director of OAPM Catherine Reeves, who issued the final decision.

From this universe of adverse employment actions, the sole potential comparator proffered in

plaintiff's Opposition is not sufficiently similarly situated to demonstrate disparate treatment.[3]

Mr. W, so-named to comply with this Court's July 20, 2004 protective order, was, at the time of

---

[3] In its Motion for Summary Judgment, the DEA discusses four individuals, identified as
Messrs. Z, M, R. and W, who were identified by plaintiff during discovery as persons whom she
considered similarly situated to herself.  (Def.'s Mot. at 16-19.)  Three of these individuals,
Messrs. Z, M and R, fall outside of the temporal limitations imposed by the discovery orders of
July 20, 2004 and January 25, 2005.  Moreover, plaintiff discusses only Mr. W in her Opposition,
omitting any reference to the other three.  (Pl.'s Opp'n at 11-19.)  Given their omission from
plaintiff's Opposition, the Court must presume that plaintiff is no longer raising a claim that
these three individuals are similarly situated.

the disciplinary action against him, employed in the same section as plaintiff in the DEA's Office

of Chief Counsel.  Mr. W, a white male, is alleged to have lied to colleagues to cover up the fact

that he had failed to fax a document to the MSPB and opposing counsel as he had promised to

do.  (Pl.'s Ex. 6.)  Mr. W then executed a sworn affidavit claiming to have attempted to fax the

document that was submitted to the MSPB in order to justify the agency's now-late filing.  (Pl.'s

Ex. 12.)  Members of DEA management discussed the matter and decided to refer it to OPR.

(Pl.'s Ex. 2.)  After bringing the matter to OPR's attention, however, OPR declined to open a

case because an investigation was unlikely to provide a definitive resolution to the question of

whether Mr. W had lied.  (Pl.'s Ex. 13.)  Consequently, OPR recommended that the Office of

Chief Counsel handle it as a management issue.[4]  (*Id.*)   Further investigation confirmed that no

attempt to fax the documents had been recorded by the machine.  (Pl.'s Exs. 7 and 8.)

Subsequent to his initial sworn statement wherein he claimed to have faxed the documents, Mr.

W submitted a second declaration confessing doubt as to whether he had successfully faxed the

documents.  His change of position supposedly resulted from later problems he experienced with

the fax machine.  (Pl.'s Ex. 14.)  After investigating the matter, Chief Counsel Cynthia Ryan

issued a reprimand stating that while she was "convinced that [Mr. W] did not transmit the

facsimile . . . as requested," she believed that he "honestly, albeit mistakenly, believed [he] sent

the facsimile as requested."  (Pl.'s Ex. 15.)   Plaintiff argues that Mr. W lied to his colleagues

---

[4]Plaintiff complains that there is no more formal document than a Memorandum for the Record (Pl.'s Ex. 13) that proves that OPR instructed the Chief Counsel's Office to treat the investigation as a management issue, implying that the agency may not have actually conferred with OPR.  (Pl.'s Opp'n at 15.)  Yet, several emails indicate an intent by DEA management team to take the matter to OPR (Pl.'s Exs. 3, 4, and 5), and plaintiff offers nothing beyond mere innuendo to cast doubt upon the DEA's version of events.

and superiors and executed a false affidavit claiming to have faxed the documents. Unfortunately for plaintiff, those allegations were not proven during the DEA's investigation of Mr. W.  As a result, given the complete absence of any evidence that the agency manipulated the investigation to protect Mr. W, no reasonable jury could find, based on the findings of the disciplinary proceedings against Mr. W, that he engaged in an offense of "comparable seriousness" to that of plaintiff.  *Holbrook*, 196 F.3d at 261 (internal quotation marks omitted). Therefore, he cannot be "similarly situated" for purposes of the disparate treatment claim.  *Id*. Mr. W was not arrested; he was not charged with obstructing police officers in the exercise of their official duties; he did not attempt to influence a witness while she was being interviewed by the police; he did not give false information during the course of a criminal investigation; he had not previously been the subject of disciplinary action while at the DEA; and he was not found to have lied during the DEA's internal investigation.  The facts overwhelmingly demonstrate that plaintiff and Mr. W were not "similarly situated in all material respects," *McGuinness*, 263 F.3d at 54, much less "nearly identical."  *Neuren*, 43 F.3d at 1514.  Having failed to point to any evidence of a similarly situated employee who received more favorable treatment than her, plaintiff cannot make out a *prima facie* case of discriminatory employment action based on disparate treatment and her claim must be dismissed.

### B.    Retaliation:  Count IV

To establish a *prima facie* claim for retaliation, a plaintiff must show that she engaged in statutorily protected activity; that she suffered from an adverse employment action; and that a causal connection existed between the two.  *See Brown*, 199 F.3d at 452; *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985).  As with a disparate treatment claim, once the plaintiff satisfies

the elements of the *prima facie* claim, the burden shifts to the defendant to articulate a legitimate

reason for its personnel action.  If the employer is able to do so, the ultimate burden remains with

the plaintiff to prove that the agency's stated rationale is pretextual.  *See Cones v. Shalala*, 199

F.3d 512, 520-21 (D.C. Cir. 2000).  Plaintiff has successfully established the first two elements

of her retaliation claim.  First, plaintiff did engage in protected activity, filing a formal EEO

complaint in 1997 that alleged discrimination for the DEA's denial of a performance award,

failure to promote her to the GS-15 pay grade, and purportedly inequitable distribution of work

assignments.  (Pl.'s Ex. 1.)  That complaint was pending at the time of her arrest in December

1998.  (Pl.'s Opp'n at 19.)  Second, plaintiff did suffer an adverse employment action when she

was suspended and the removed from federal service.  (Def.'s Exs. 1-F and 1-J.)  Thus, her

retaliation claim hinges on her ability to demonstrate causation.

   Plaintiff has introduced no direct evidence that her suspension and removal were the

result of a retaliatory animus.  In the absence of direct evidence, the Court may infer a causal

connection on a "showing that the employer had knowledge of the employee's protected activity,

and that the adverse personnel action took place shortly after that activity."  *Mitchell*, 759 F.2d at

86.  "By showing both knowledge and proximity in time, plaintiff may establish the causal

connection needed for a *prima facie* case of retaliation."  *Brodetski v. Duffey*, 141 F. Supp. 2d 35,

42-43 (D.D.C. 2001).  Plaintiff can point to evidence that the agency officials responsible for her

suspension and eventual termination had some knowledge of her protected EEO activity.  During

plaintiff's consolidated appeal before the MSPB, Deputy Administrator Donnie Marshall denied

having any knowledge of plaintiff's EEO complaint when he recommended indefinite suspension

on January 21, 1999.  (Pl.'s Ex. 35.)  Marshall later filed a declaration amending this testimony,

14

however, when he realized that he had in fact spoken with an EEO counselor on June 3, 1998,

regarding plaintiff's complaint. (*Id.*)  Other management officials in the Chief Counsel's office

were also aware of plaintiff's protected activity.  (Pl.'s Ex. 19.)  There is no evidence in the

record that the deciding official, Catherine Reeves, had any knowledge of the EEO complaint.

Nevertheless, taking the evidence in the light most favorable to plaintiff, this Court will assume

knowledge as of June 3, 1998 in its causation analysis.

To establish causation, however, plaintiff must pair knowledge with proximity.  This she

has been unable to do.  "[C]ourts have not established the maximum time lapse between

protected Title VII activity and alleged retaliatory actions."  *Brodetski*, 141 F. Supp. 2d at 43.

Nevertheless, when a court is asked to "accept mere temporal proximity between an employer's

knowledge of protected activity and an adverse employment action as sufficient evidence of

causality," the Supreme Court has cautioned that "the temporal proximity must be 'very close.' "

*Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (*quoting O'Neal v. Ferguson Constr.

Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001)).  In two of the cases the Supreme Court cited to

support this proposition, the circuit courts rejected delays of less than 4 months as insufficient to

establish causation.  *See Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997)

(3-month delay insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992)

(4-month delay insufficient).  This Court has often followed a three-month rule to establish

causation on the basis of temporal proximity alone.  *See Buggs v. Powell*, 293 F. Supp. 2d 135,

148 (D.D.C. 2003); *Gustave-Schmidt v. Chao*, 360 F. Supp. 2d 105, 118-19 (D.D.C. 2004)

(referring to end of three-month window as "outer limit" of "temporal requirement in a

retaliation case").  In this case, the earliest possible adverse action -- Deputy Administrator

Marshall's proposal of indefinite suspension -- did not occur until January 21, 1999, more than

six months after he learned of plaintiff's protected activity.  Marshall's proposal to remove

plaintiff from federal service did not come until almost two years after she filed the 1997 EEO

complaint.  Faced with this set of facts, plaintiff cannot, as a matter of law, demonstrate

causation on the basis of knowledge and temporal proximity, *Clark Cty. Sch. Dist.*, 532 U.S. at

273, and has therefore failed to establish a *prima facie* case of retaliation.

      Moreover, even if the Court were to hold that plaintiff has established temporal proximity

sufficient to make out a *prima facie* case, plaintiff could not defeat summary judgment because

she cannot point to any evidence that the agency's legitimate, non-discriminatory reasons for her

suspension and termination are pre-textual.  *See Cones*, 199 F.3d at 520-21.  As noted above,

once a plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to

provide a non-discriminatory rationale for its actions.  *Id*.  A plaintiff must then rebut the

legitimate explanation by demonstrating either that "a discriminatory reason more likely

motivated the employer or indirectly by showing that the employer's proffered explanation is

unworthy of credence." *Burdine*, 450 U.S. at 256 (applying *McDonnell Douglas* in the context

of discrimination, rather than retaliation, claim); *accord Cones*, 199 F.3d at 520-522 (applying

pretext analysis from *McDonnell Douglas* to Title VII retaliation claim).  If the plaintiff can

identify "evidence from which a jury could find that the employer's stated reasons were

pretextual," it will usually "be enough to get a plaintiff's claim to a jury." *George*, 407 F.3d at

413 (internal citations and alterations omitted).  Nevertheless, the defendant may still prevail on

summary judgment if the facts demonstrate that the defendant "honestly and reasonably

believed" the reasons proffered for the adverse employment action such that the court may decide

"*as a matter of law* that [defendant] possessed a good-faith belief in those reasons." *Id*. at 416 (emphasis in original).

Other than her argument regarding Mr. W, discussed *supra*, plaintiff attempts to establish pretext by impugning Deputy Administrator Marshall's credibility by referencing his initial denial and subsequent acknowledgment of knowledge, at the time of his recommendation to suspend and then terminate plaintiff, of plaintiff's pending 1997 EEO complaint.  (Pl.'s Opp'n at 21.)  Marshall's June 8, 2001 declaration stated that when discussing his testimony with the DEA Chief Counsel Cynthia Ryan, she reminded him that he spoke with an EEO counselor in early June 1998 regarding plaintiff's pending complaint.  (Pl.'s Ex. 35, ¶ 7.)  According to Marshall, he had no "independent recollection" of the meeting at the time of his testimony and only a "vague recollection" of it after talking about it with Ryan.  (*Id*.)  Further, his declaration reiterated his sworn testimony that regardless of when he learned of plaintiff's protected activity, it had no impact on his decision to propose indefinite suspension and termination for plaintiff's actions.  (*Id*. ¶ 10.)  Marshall's corrected testimony is a thin reed upon which to hang an allegation of pretext.  Plaintiff's argument implies that Marshall lied in his initial sworn testimony on April 24, 2001, in order to mislead the MSPB as to his true motivation for proposing that plaintiff be suspended and terminated.  Yet this inference is belied by the fact that Marshall actively brought the discrepancy to the MSPB's attention by filing the declaration.  In contrast to the extensive evidence supporting the agency's legitimate, non-discriminatory rationale for its decision, plaintiff's argument consists of little more than "her own speculations and allegations," *Brown*, 199 F.3d at 458, which are inadequate to permit a reasonable jury to find the agency's stated rationale "unworthy of credence," *Burdine*, 450 U.S. at 256.  Moreover,

17

the Court will "not second-guess an employer's personnel decision absent demonstrably discriminatory motive. Once the employer has articulated a non-discriminatory explanation for its action," the Court will not find pretext if "the employer honestly believes in the reasons it offers." *Fischbach v. Dist. of Columbia Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996).

In sum, plaintiff has not introduced any evidence that Marshall or Reeves acted with any discriminatory or retaliatory motive or that they did not honestly believe in their own explanations for suspending and terminating plaintiff.[5] Therefore, her Title VII claims will be dismissed.

## III.   Civil Service Reform Act:  Counts VII & VIII

Counts VII and VIII of the Amended Complaint challenge the MSPB's decision upholding plaintiff's suspension and removal.  (Am. Compl. ¶¶ 62-84.)  Court review of an MSPB decision is governed by two different standards.  Plaintiff's affirmative defenses that she was terminated on the basis of discrimination or retaliation are reviewed *de novo*.  5 U.S.C. § 7702(e)(3).  The nondiscrimination findings of the MSPB Administrative Judge ("ALJ") are reversible only if they were arbitrary or capricious, obtained without lawful procedures, or were

---

[5] This same pretext analysis would apply to plaintiff's discrimination claim if she had met the requirements for a *prima facie* case.  *Paquin*, 119 F.3d at 27-28.  Plaintiff asserts pretext on the basis of an email between Robert Richardson, Robert Gleason and DEA General Counsel Cynthia Ryan, in which Richardson comments that the difference between Mr. W and plaintiff is not "black and white . . . (no pun intended.)"  (Pl.'s Ex. 3.)  Yet, despite the unfortunate and ill-advised pun, the context of the email demonstrates that the interlocutors were committed to treating Mr. W and plaintiff similarly by referring both to OPR.  The email also enumerates the ways in which DEA management viewed plaintiff's behavior as more egregious than Mr. W's, which supports the agency's decision to discipline the two differently.  Thus, the Court finds that even if plaintiff had successfully made out a *prima facie* case of employment discrimination (which she did not), her claim would nevertheless be dismissed for failure to rebut the agency's evidence that its articulated explanation for terminating plaintiff was not pretextual.

unsupported by substantial evidence.  5 U.S.C. § 7703(c).  *See Fogg*, 254 F.3d at 110-11 (court

must review non-discrimination findings "deferentially, upsetting it only if it was arbitrary and

capricious or an abuse of discretion, or if it was unsupported by substantial evidence.").  *See also*

*Barnes v. Small*, 840 F.2d 972, 979 (D.C. Cir. 1988); *Butler v. West*, 164 F.3d 634, 639 n.10

(D.C. Cir. 1999).  Insofar as the ALJ's findings are based upon credibility assessments, these are

"virtually unreviewable"; and a plaintiff's *de facto* request for the Court to "re-weigh conflicting

evidence" is inconsistent with the reviewing court's function.  *See Bieber v. Dep't of the Army*,

287 F.3d 1358, 1364 (Fed. Cir. 2002).  Further, in assessing whether the MSPB's ruling was

supported by substantial evidence, a court is limited to determining "whether the agency . . .

could fairly and reasonably find the facts that it did," and "[a]n agency conclusion may be

supported by substantial evidence even though a plausible alternative interpretation of the

evidence would support a contrary view."  *Robinson v. NTSB*, 28 F.3d 210, 215 (D.C. Cir. 1994)

(internal quotation marks and citations omitted).

An agency is justified in taking an adverse employment action such as suspension or

removal "only for such cause as will promote the efficiency of the service."  5 U.S.C. § 7513(a).

"As the case law has developed, courts have framed the 'efficiency of the service' issue in terms

of requiring a 'nexus' between . . . 'the articulated grounds for an adverse personnel action and

either the employee's ability to accomplish his or her duties satisfactorily or some other

legitimate governmental interest promoting the 'efficiency of the service.'"  *Yacovone v. Bolger*,

645 F.2d 1028, 1032 (D.C. Cir. 1981) (quoting *Doe v. Hampton*, 566 F.2d 265, 272 (D.C. Cir.

1977) (internal quotations omitted)).  This requirement has been translated into a three-part test

in which the agency must prove by a preponderance of the evidence that:  (1) the charged

conduct occurred; (2) there is a nexus between the conduct and the efficiency of the service; and

(3) the penalty imposed is reasonable.  *Pope v. U.S. Postal Serv.*, 114 F.3d 1144, 1147 (Fed. Cir.

1997).

Plaintiff argues that neither her suspension nor her removal was supported by substantial

evidence before the MSBP.  Specifically with respect to her suspension, she asserts that the ALJ

mistakenly believed that plaintiff was given 30 days to respond to her proposed indefinite

suspension (Pl.'s Opp'n at 24-25), and that the agency improperly relied on hearsay evidence.

(*Id*. at 25-26.)  Even if true, neither error would mandate reversal of the ALJ's decision.  Because

the DEA reasonably believed that plaintiff's misconduct could result in imprisonment,[6] DEA

regulations required the plaintiff to respond within seven days to the proposal, rather than the

standard 30.  *See* 5 C.F.R. § 752.404(d).  (*See also* Def.'s Ex. 1-E (Proposal Letter).)  In fact,

though the proposal letter gave plaintiff only seven days to respond, she was eventually permitted

more than 30 days to reply.  (Def.'s Ex. 1-L.)  Moreover, even if plaintiff had been held to the

shortened reply period, a pending criminal prosecution for obstruction of justice is more than

sufficient to justify the agency's reasonable belief that plaintiff faced jail time for her

misconduct.[7]  With respect to plaintiff's complaint regarding the use of hearsay (*see* Pl.'s Opp'n

---

[6]At the time of plaintiff's arrest, obstruction of justice was a Class 2 misdemeanor under Virginia law, which carried with it a maximum sentence of six months in jail and a $1000 fine. Va. Code Ann. §§ 18.2-11, 18.2-460 (1996).

[7]Plaintiff also argues that the agency did not interview her before proposing suspension (Pl.'s Opp'n at 24-25), implying that she was somehow denied an opportunity to present her version of the events or that the agency therefore lacked a reasonable belief that her conduct could result in jail time.  Neither is the case.  Notwithstanding plaintiff's initial phone call to her supervisor, in which explained her version of the events, her written response to the suspension

at 26), it is well-established that "hearsay is admissible in administrative proceedings generally and in adverse action proceedings in particular." *Hoska v. Dep't of the Army*, 677 F.2d 131, 138 (D.C. Cir. 1982). "Moreover, under certain circumstances, hearsay can constitute substantial evidence." *Id.*; *see also Johnson v. United States*, 628 F.2d 187, 190-91 (D.C. Cir. 1980) (hearsay may be substantial evidence where declarants are disinterested witnesses and statements are essentially consistent).

Considering more generally whether the agency successfully established by a preponderance of the evidence that the efficiency of the service would be improved by plaintiff's initial suspension and eventual removal, the Court can easily conclude that the agency has met its burden. The ALJ received testimony from plaintiff, four police officers, Carl Jackson, the proposing officer Donnie Marshall, the deciding officer Catherine Reeves, Lelia Jackson and others. After weighing the testimony, he found the testimony of the officers to be "essentially consistent with other evidence, including their written statements and reports, with each other's version of events, [and] with their prior testimony." (Def.'s Ex. 1-L at 7.) Plaintiff's and Jackson's testimony, on the other hand, were found to be "inherently very unlikely" and in some instances "unbelievable." (*Id.* at 7-8, 13.) Given the volume of evidence indicating that plaintiff did in fact obstruct the police officers as they were attempting to arrest Carl Jackson III and the fact that an ALJ's credibility determinations are "virtually unreviewable," *Bieber*, 287 F.3d 1364, the Court finds that the ALJ's findings regarding the charged conduct are supported by more than substantial evidence. Likewise, substantial evidence -- specifically the testimony of Reeves and

proposal provided a more than adequate opportunity to set forth her defense. Moreover, as discussed above, *supra* note 5 and accompanying text, the agency's reasonable belief was firmly grounded in the arrest reports and pending criminal prosecution.

Marshall -- supports the ALJ's determination that a nexus exists between the efficiency of the service and plaintiff's misconduct.  Obstructing police officers in the exercise of their official duties, making false statements, and attempting to influence a witness in the middle of a criminal investigation can certainly be viewed as being antithetical to promoting an efficient service. Lastly, the ALJ's finding that the indefinite suspension and removal were reasonable punishments is supported by substantial evidence.  In light of plaintiff's three past disciplinary actions, *see Lewis v. Dep't of Veterans Affairs*, 80 M.S.P.R. 472, 475-76 (1998),  the high level of trust among employees needed to fulfill the agency's mission, *see Haack v. U.S. Postal Serv.*, 68 M.S.P.R. 275, 283 (1995), and the rigorous ethical standards to which attorneys are held, the agency had ample justification for its finding that the efficiency of the agency would be improved by suspending and then removing plaintiff from federal service.


## CONCLUSION

Accordingly, the defendant's Motion for Summary Judgment is granted on all remaining counts, and the MSPB's August 12, 2002 Final Order denying plaintiff's petition for review is affirmed.  An appropriate Order accompanies this Memorandum Opinion.


_____
          s/
ELLEN SEGAL HUVELLE
United States District Judge

Date:  August 30, 2005